| ROBERT MIDDLETON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 09-242 |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

### I. INTRODUCTION

Plaintiff, Robert Middleton, seeks judicial review of a

decision of defendant, Commissioner of Social Security ("the

Commissioner"), denying his application for disability insurance

benefits ("DIB") under Title II of the Social Security Act, 42

U.S.C. §§ 401-433.¹  Presently before the Court are the parties'

cross-motions for summary judgment pursuant to Rule 56 of the

Federal Rules of Civil Procedure.  For the reasons set forth

below, plaintiff's motion for summary judgment will be denied and

---

¹In order to establish a disability under the Social
Security Act, a claimant must demonstrate an inability to engage
in any substantial gainful activity due to a medically
determinable physical or mental impairment which can be expected
to last for a continuous period of not less than 12 months.  42
U.S.C. § 423(d)(1).  A claimant is considered unable to engage in
any substantial gainful activity only if his physical or mental
impairment or impairments are of such severity that he is not
only unable to do his previous work but cannot, considering his
age, education, and work experience, engage in any other kind of
substantial gainful work which exists in the national economy.
42 U.S.C. § 423(d)(2)(A).

1

the Commissioner's cross-motion for summary judgment will be granted.[2]

## II. BACKGROUND

### A. Procedural History

On June 12, 2001, plaintiff filed an application for DIB alleging disability since May 24, 1995 due to conversion disorder.[3] (CA 06-594, R. 145-47, 173).[4] Subsequently, plaintiff amended his application to change the alleged onset

---

[2]The Court has jurisdiction of this appeal under 42 U.S.C. § 405(g), which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the individual resides.

[3]Conversion disorder is a condition in which a person shows psychological stress in physical ways. Conversion disorder usually appears suddenly after a stressful event. For example, a person's leg may become paralyzed after falling from a horse even though the person was not hurt. Conversion disorder signs and symptoms appear with no underlying physical cause, and the person cannot control them. Signs and symptoms of conversion disorder typically affect a person's movement or senses, such as the ability to walk, swallow, see or hear. Conversion symptoms can be severe, but for most people, they get better within a few weeks. www.MayoClinic.com/health/conversion-disorder (last visited 5/1/2009). Plaintiff's diagnosis of conversion disorder related to pseudo-seizures for which plaintiff was treated on numerous occasions in 1995 while he was in the Marine Corps and under stress.

[4]All citations beginning with "CA 06-594, R. __" or "CA 06-594, Doc. No. __" relate to Civil Action No. 06-594 which was plaintiff's initial appeal of the denial of his application for DIB. All other citations to the record relate to the present case which is plaintiff's second appeal from an adverse decision following supplemental proceedings.

date of disability from May 24, 1995 to May 15, 2001.[5]  (CA 06-594, R. 148).  Plaintiff's insured status for purposes of entitlement to DIB expired on March 31, 2005.  Therefore, to receive DIB, plaintiff must establish that he was disabled as result of his mental impairment before March 31, 2005.  (R. 15).

Plaintiff's application was denied initially and upon reconsideration, and plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (CA 06-594, R. 35-37, 120-23, 127).  At the hearing, which was held by ALJ Steven Slahta on December 9, 2003, plaintiff, who was represented by counsel, and a  vocational expert ("VE") testified.  (CA 06-594, R. 206-36).  On March 23, 2004, ALJ Slahta issued a decision denying plaintiff's application for DIB.  Specifically, based on the VE's testimony, ALJ Slahta concluded that although plaintiff suffers from severe mental impairments, including a personality disorder, major depression and an anxiety disorder,[6] he retained the

---

[5]With respect to the alleged onset date of plaintiff's disability, conflicting information was provided by plaintiff in the Disability Report completed on the date he filed his application for DIB.  Specifically, plaintiff indicated that he became unable to work because of his conversion disorder on May 24, 1995.  Plaintiff then indicated that he actually stopped working on May 11, 2001, and plaintiff listed the various jobs he held between those dates.  In addition, plaintiff did not indicate that he stopped working on May 11, 2001 due to his alleged disabling condition.  Rather, plaintiff indicated that he stopped working on that date because his "position was not available anymore."  (CA 06-594, R. 173-74).

[6]In determining plaintiff's severe impairments, the ALJ rejected plaintiff's diagnosis of conversion disorder.  He also

3

residual functional capacity ("RFC") to perform a significant

range of very heavy work, including the jobs of a small parts

assembler and a housekeeper.[7]  (CA 06-594, R. 42-55).

Plaintiff requested review of ALJ Slahta's decision;

however, the Appeals Council denied the request on March 10,

2006.  (CA 06-594, R. 57-59, 133).  On May 2, 2006, plaintiff,

initially proceeding *pro se*, filed a complaint in this Court for

judicial review of ALJ Slahta's adverse decision.  (CA 06-594,

Doc. No. 3).  The case was assigned Civil Action No. 06-594, and,

pursuant to the standard procedures of this Court, the parties

were directed to file cross-motions for summary judgment under

Fed.R.Civ.P. 56.  (CA 06-594, Doc. No. 8).

On April 25, 2007, the Court filed a Memorandum Opinion and

Order granting plaintiff's motion for summary judgment with

respect to his request for a remand of the case due to several

errors by ALJ Slahta.  Specifically, on remand, the Commissioner

was directed to schedule a supplemental hearing on plaintiff's

application for DIB to (1) reconsider ALJ Slahta's rejection of

plaintiff's diagnoses of conversion disorder and cognitive

---

rejected plaintiff's diagnosis of cognitive disorder, not
otherwise specified, which had been rendered by Thomas Harbin,
Ph.D. in March 1997.  (CA 06-594, R. 28-29).

[7]RFC is defined in the Social Security Regulations as the
most a claimant can still do despite his or her limitations.  20
C.F.R. § 404.1545.

4

disorder which was based on his lay opinion, rather than medical evidence, (2) address the reports of Leon Kalson, Ph.D. and R. Lees, Ph.D. which supported plaintiff's claim for DIB because ALJ Slahta failed to mention these reports in his adverse decision, (3) address the determination of the Veterans Administration ("VA") that plaintiff is totally disabled from employment as a result of his mental impairments because ALJ Slahta failed to discuss the significance of the VA's disability determination on plaintiff's application for DIB, and (4) obtain additional testimony from a VE because ALJ Slahta's impermissible rejection of plaintiff's diagnoses of conversion disorder and cognitive disorder may have resulted in a hypothetical question that did not include all of the functional limitations resulting from plaintiff's mental impairments. (CA 06-594, Doc. Nos. 22 and 23).

Pursuant to the Court's remand Order, a supplemental hearing on plaintiff's application for DIB was held before ALJ George A. Mills, III, on October 24, 2007. Plaintiff, who was represented by counsel, a medical expert and a VE testified at the hearing. (R. 1153-1206). On November 15, 2007, ALJ Mills issued a decision in which he also denied plaintiff's application for DIB. Specifically, based on the testimony of the medical expert and the VE, ALJ Mills concluded that, despite the severe impairments of a history of pseudo-seizures, a major depressive disorder and

5

a generalized anxiety disorder, plaintiff retained the RFC to
perform a significant range of work at all exertional levels.
(R. 14-28). Plaintiff requested review of ALJ Mills' adverse
decision which was denied by the Appeals Council on February 26,
2008. (R. 2-4, 7).

On March 3, 2008, proceeding *pro se*, plaintiff filed a
timely appeal of ALJ Mills' adverse decision. However, plaintiff
mistakenly filed the appeal in the United States Court of Appeals
for the Third Circuit, rather than this Court. (CA 06-594, Doc.
No. 29). Construing plaintiff's appeal as an appeal from this
Court's Memorandum Opinion and Order dated April 25, 2007, the
Third Circuit Court of Appeals dismissed plaintiff's appeal for
lack of jurisdiction because it had been filed more than 60 days
after the Court's April 25, 2007 Order became final. (CA 06-594,
Doc. Nos. 32 and 33).

On November 7, 2008, plaintiff moved in this Court to file
an appeal *nunc pro tunc* from the adverse decision issued by ALJ
Mills on November 15, 2007, based on his timely appeal from ALJ
Mills' adverse decision, albeit in the wrong court. (CA 06-594,
Doc. No. 34). The Commissioner did not oppose plaintiff's
motion, and the motion was granted on November 18, 2008. (CA 06-
594, Doc. Nos. 36 and 37). Two days later, plaintiff filed a *pro
se* complaint. (CA 06-594, Doc. No. 38).

Prior to filing an answer, the Commissioner moved for an Order directing the Clerk of Court to assign a new civil action number to plaintiff's appeal from ALJ Mills' adverse decision. (CA 06-594, Doc. No. 42). The motion was granted by the Court on February 24, 2009 (CA 06-594, Doc. No. 43), and this appeal was assigned Civil Action No. 09-242. Again, pursuant to the standard procedures of this Court, the parties have filed cross-motions for summary judgment which are ripe for decision.

## B. Plaintiff's Hearing Testimony

Plaintiff's testimony at the hearing held by ALJ Slahta on December 9, 2003 was summarized at length in the Memorandum Opinion filed in Civil Action No. 06-594 on April 25, 2007. (CA 06-594, Doc. No. 22, pp. 3-8). For purposes of plaintiff's present appeal from the denial of his application for DIB, the Court adopts the summary which is attached hereto as Exhibit A.[8]

## C. Evidence in the Record

The Court also adopts, in its entirety, the lengthy summary of the medical evidence in plaintiff's administrative file which was set forth in the Memorandum Opinion filed in Civil Action No.

---

[8]A summary of plaintiff's testimony during the supplemental hearing before ALJ Mills on October 24, 2007 is unnecessary. The testimony was brief and did not differ in any material respect from the testimony offered by plaintiff at the hearing before ALJ Slahta on December 9, 2003. Moreover, the supplemental hearing took place 2½ years after the expiration of plaintiff's insured status for purposes of DIB.

06-594 on April 25, 2007 (CA 06-594, Doc. No. 22, pp. 9-32), and
that summary is attached hereto as Exhibit B. In addition, the
current record contains the following medical evidence relating
to the relevant time period for purposes of plaintiff's
application for DIB:

**Report of William R. Bodner, Jr., M.D. - 6/28/02**

On June 28, 2002, Dr. William R. Bodner, Jr. performed a
general psychiatric examination of plaintiff for the VA. With
respect to the history of his illness, plaintiff reported that he
had been experiencing psychiatric problems for 4 or 5 years; that
he suffered from fatigue, sleep disturbance, depression and
irritability, although his ability to concentrate was good; that
he had been free of pseudo-seizures since his discharge from the
Marine Corps in 1995; that he had not been receiving psychiatric
treatment since his discharge from the military and was not
taking any psychiatric medications at that time; and that he
lived with his fiancee, did chores around the house, has friends,
likes to shoot pool and goes to church. As to plaintiff's mental
status, Dr. Bodner noted that plaintiff was alert and
cooperative, casually but neatly dressed, answered questions and
volunteered information, did not exhibit loose associations,
flight of ideas, bizarre motor movements or tics, was a bit tense
but friendly, had an appropriate affect, was oriented x3, had
good remote and recent memory, and had adequate insight, judgment

8

and intellectual capacity.  Dr. Bodner diagnosed plaintiff with
"1. Anxiety disorder, NOS, 2. Cognitive disorder, NOS, mild," and
he rated plaintiff's score on the Global Assessment of
Functioning ("GAF") scale a 60.[9]  (R. 399-402).

## Progress Note of Tina Reiter, D.O. - 11/7/03

On November 7, 2003, plaintiff attended an individual
psychotherapy session with Tina Reiter, D.O.  Dr. Reiter noted
that plaintiff had a history of generalized anxiety disorder, and
that he was being seen that day "to get back into [treatment]."
Plaintiff indicated that he wanted to decrease his anxiety,
reporting excessive worrying, tension, irritability and fatigue.
Regarding plaintiff's mental status examination, Dr. Reiter noted
that plaintiff was clean and casually groomed, made good eye
contact, was polite and cooperative, had normal speech, displayed
an anxious mood with congruent affect, had logical thoughts, was
goal directed and displayed good insight and judgment.

---

[9]The GAF scale is used by clinicians to report an
individual's overall level of functioning.  The GAF scale does
not evaluate impairments caused by physical or environmental
factors.  Rather, the GAF Scale considers psychological, social,
and occupational functioning on a hypothetical continuum of
mental health - illness.  The highest possible score is 100, and
the lowest is 1.  A GAF score between 51 and 60 denotes
"**[m]oderate symptoms** (e.g., flat affect and circumstantial
speech, occasional panic attacks) **OR moderate difficulty in
social, occupational, or school functioning** (e.g., few friends,
conflicts with peers or co-workers)."  (Emphasis in original).
American Psychiatric Association, Diagnostic and Statistical
Manual of Mental Disorders, Fourth Edition, pp. 32-34.

9

Plaintiff's diagnosis and treatment options were discussed, and plaintiff agreed to a trial of Prozac.[10] (R. 1092).

## Report of Steven Pacella, Ph.D. - 2/9/04

On January 29, 2004, Steven Pacella, Ph.D. performed a consultative psychological examination of plaintiff at the request of the Pennsylvania Bureau of Disability Determination.[11] Dr. Pacella noted that during the examination, plaintiff was alert, oriented, adequately responsive, maintained good eye contact, displayed no signs of acute anxiety, offered clear, relevant and coherent thinking, exhibited no prominent defect of remote recall for most details, but reflected poor judgment and limited insight. Dr. Pacella administered various tests to plaintiff and summarized his conclusions on the effects of plaintiff's mental impairments on his ability to function as follows:

"The results of the MSE reflect the fact that Mr. Middletown (sic) is well able to understand, retain and follow instructions, and that he suffers from no defect of attention or concentration whatsoever. Despite his "35 to 40" inpatient admissions to psychiatric hospitals in 1995, Mr. Middletown (sic) has not been hospitalized since, had been employed as recently as three years ago and had denied, otherwise, any acute or chronic problems with peers or authority figures - as he denied any juvenile or adult criminal record. He is in no danger of imminent

---

[10]Prozac is used to treat depression. www.nlm.nih.gov/medlineplus/druginfo (last visited 5/1/2009).

[11]Prior to the examination, Dr. Pacella was provided with plaintiff's medical records for review. (R. 1093).

10

decompensation but is, certainly, capable of manufacturing a reason to get himself hospitalized. He is independent in self-care and all ADL's; he can clean, shop, cook, take the bus, pay bills, maintain a residence and care for his grooming and hygiene, independently. Social maturity is congruent with chronological age and he communicates well. Mr. Middletown (sic) is well aware of hazards, can take precautions and can make simple decisions. I see no reason - assuming no legitimate physical contraindication - why he would not be able to work within a schedule, attend to a task or sustain a consistent, competitive routine. Whether Mr. Middletown (sic) has any specific, underlying psychological need to present himself as impaired (which would suggest a factitious disorder) I cannot decide based solely upon one interview; however, the diagnosis of conversion disorder is not appropriate here. The diagnosis of a disassociative identity disorder is not appropriate."

Dr. Pacella's diagnoses included (1) Personality Disorder, NOS, (2) Major Depression, by history, in remission, (3) Pseudo-Seizures, by history and (4) Rule out Factitious Disorder. (R. 1093-98).

Dr. Pacella also completed an assessment of plaintiff's ability to perform work-related mental activities, rendering the opinion that plaintiff's mental conditions caused no limitations in his ability to understand, remember and carry out detailed instructions or his ability to make judgments on simple work-related decisions, and that plaintiff's mental conditions resulted in moderate limitations in his ability to interact appropriately with the public, supervisors and co-workers, respond appropriately to work pressures in a usual work setting and respond appropriately to changes in a routine work setting. (R. 1099).

11

**Testimony of C. David Blair, Ph.D. - 10/24/07**

As noted previously, during the supplemental hearing on
plaintiff's application for DIB, a medical expert, C. David
Blair, Ph.D., was called to testify.[12] Dr. Blair's testimony may
be summarized as follows:

The medical evidence in plaintiff's administrative file
revealed "actually nothing major" as far as his mental conditions
during the period that is relevant for purposes of plaintiff's
application for DIB, *i.e.*, May 15, 2001 to March 31, 2005.[13]
Although plaintiff had been diagnosed with conversion disorder
due to pseudo-seizures in April 1995, when he was in the military
and under a good deal of stress, his conversion symptoms had
"cleared a long time ago" and were not active during the relevant
time period.[14] Plaintiff's then current complaints of numbness
or tingling in his extremities when under stress are not
conversion symptoms. Rather, the diagnosis of conversion

---

[12]According to his curriculum vitae, Dr. Blair practices in
the areas of clinical psychology, clinical neuropsychology,
health and rehabilitation psychology and forensic psychology.
(R. 140-44).

[13]Dr. Blair was provided with the medical evidence in
plaintiff's administrative file to review prior to his testimony.
(R. 1166).

[14]In this regard, Dr. Blair noted, among other things, a
report from Camp LeJeune dated December 5, 2001, which indicated
that plaintiff's conversion disorder was "resolved." (R. 1167).

12

disorder by various medical sources following plaintiff's discharge from the military was merely a "carry over" of that diagnosis without supporting conversion symptoms, such as blindness or paralysis.[15]   (R. 1166-68, 1172).

As to plaintiff's diagnosis of cognitive disorder, NOS in May 1997 by Dr. Thomas Harbin, a neuropsychologist, the diagnosis was based on "one basic problem" that was revealed during a test administered to plaintiff by Dr. Harbin, *i.e.*, the Taylor complex figure test.  Specifically, in copying the figure, plaintiff displayed difficulty organizing the figure and then recalling it. However, plaintiff's difficulty was related to the inefficient manner in which he performed the task and does not necessarily show that plaintiff has difficulty with either construction or with memory for non-verbal stimuli.  Moreover, Dr. Harbin administered only one "effort test" to plaintiff and the test is "not a very good one."  In light of plaintiff's "fairly decent" performance on the other tests administered by Dr. Harbin, *i.e.*, he tested in the normal range with respect to attention and concentration and language functions, etc., plaintiff does not

---

[15]In particular, Dr. Blair noted that Leon Kalson, Ph.D., who conducted a clinical psychological evaluation of plaintiff at the request of the Pennsylvania Bureau of Disability Determination on August 14, 2001, diagnosed plaintiff with conversion disorder in the absence of evidence of conversion symptoms.  Dr. Blair interpreted Dr. Kalson's diagnosis of conversion disorder as simply an unsupported "repeat of what other people have said previously."  (R. 1170-71).

13

have a major problem from a cognitive disorder.[16] (R. 1168-70).

Considering all of plaintiff's diagnoses by various medical sources during the relevant time period, which include conversion disorder, cognitive disorder, personality disorder, major depression and anxiety, plaintiff's mental conditions resulted in mild limitations in activities of daily living and social functioning and moderate limitations in concentration, persistence and pace. (R. 1175-76). With regard to his mental RFC, plaintiff retained the ability to perform simple, unskilled work and "perhaps something somewhat more complicated than that might be possible," and plaintiff should be limited to jobs requiring only occasional contact with people due to his self reports of difficulty with people and paranoia. (R. 1182-83).

---

[16]On April 25, 2001, R. Lees, Ph.D. conducted a compensation and pension examination of plaintiff in connection with a request by plaintiff for an increase in his service-connected disability rating by the VA. Dr. Lees diagnosed plaintiff as suffering from "Cognitive deficit, not otherwise specified (conversion disorder/ pseudoseizures), chronic" and rendered the opinion that plaintiff did not appear to be able to maintain employment. In addition to severe symptoms of depression and anxiety, Dr. Lees noted that plaintiff exhibited conversion symptoms of numbness and a prickly sensation when under stress. (R. 467-71). With regard to this report, Dr. Blair noted that Dr. Lees combined plaintiff's previous diagnoses of conversion disorder and cognitive deficits, despite the fact that these conditions are not related. Dr. Blair also noted there was no evidence that plaintiff's complaints of numbness and a prickly sensation when under stress "would be a significant or substantial problem to him in terms of doing daily tasks." (R. 1171-72).

## D. **ALJ'S Decision on Remand**

When presented with a claim for disability benefits, an ALJ must follow a sequential evaluation process, which was described by the United States Supreme Court in Sullivan v. Zebley, 493 U.S. 521 (1990), as follows:

\* \* \*

Pursuant to his statutory authority to implement the SSI Program, (footnote omitted) the Secretary has promulgated regulations creating a five-step test to determine whether an *adult* claimant is disabled. See Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). (footnote omitted). The first two steps involve threshold determinations that the claimant is not presently working and has an impairment which is of the required duration and which significantly limits his ability to work. See 20 C.F.R. §§ 416.920(a) through (c)(1989). In the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work. See 20 C.F.R. pt. 404, subpt. P, App. 1 (pt. A)(1989). If the claimant's impairment matches or is "equal" to one of the listed impairments, he qualifies for benefits without further inquiry. § 416.920(d). If the claimant cannot qualify under the listings, the analysis proceeds to the fourth and fifth steps. At these steps, the inquiry is whether the claimant can do his own past work or any other work that exists in the national economy, in view of his age, education, and work experience. If the claimant cannot do his past work or other work, he qualifies for benefits. §§ 416.920(e) and (f).

\* \* \*

493 U.S. at 525-26.

The claimant bears the burden of establishing steps one through four of the sequential evaluation process. At step five, the burden shifts to the Commissioner to consider "vocational factors" (the claimant's age, education and past work experience)

15

and determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. Ramirez v. Barnhart, 372 F.3d 546, 550-51 (3d Cir.2004).

With respect to ALJ Mills' application of the five-step sequential evaluation process on remand, steps one and two were resolved in plaintiff's favor: that is, based on the record, ALJ Mills found that plaintiff had not engaged in substantial gainful activity since his alleged onset date of disability of May 15, 2001, and that plaintiff suffered from the severe impairments of a history of pseudo-seizures, major depressive disorder and generalized anxiety disorder. (R. 16-17). Turning to step three, ALJ Mills found that plaintiff's impairments did not meet or medically equal, either singly or in combination, any of the impairments listed in Section 12.00 of Appendix 1 to Subpart P of Part 404 of the Social Security Regulations, which pertain to Mental Disorders. (R. 17-22). With regard to step four, ALJ Mills found that plaintiff was unable to perform his past relevant work because the jobs were skilled or semi-skilled in nature and plaintiff's RFC was limited to a range of simple work activity. (R. 27). Finally, at step five, based on the testimony of the medical expert and the VE, ALJ Mills found that plaintiff was capable of performing jobs existing in significant numbers in the national economy, including the jobs of a truck unloader, a kitchen attendant, a laundry worker, an office

16

cleaner, an office assistant and a general sorter. Thus, ALJ
Mills issued a decision denying plaintiff's application for DIB.
(R. 28).

## III. LEGAL ANALYSIS

The Court's review of the Commissioner's decision is limited
to determining whether the decision is supported by substantial
evidence, which has been described as "such relevant evidence as
a reasonable mind might accept as adequate to support a
conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971).
It consists of something more than a mere scintilla, but
something less than a preponderance. Dobrowolsky v. Califano,
606 F.2d 403, 406 (3d Cir.1979). Even if the Court would have
decided the case differently, it must accord deference to the
Commissioner and affirm the findings and decision if supported by
substantial evidence. Monsour Medical Center v. Heckler, 806
F.2d 1185, 1190-91 (3d Cir.1986).

i

As noted previously, following the first hearing on
plaintiff's application for DIB, ALJ Slahta rejected plaintiff's
diagnoses of conversion disorder and cognitive disorder without
any medical evidence to support the rejection, which is
impermissible. Due to this error, ALJ Slahta did not reach the
issue of the functional limitations, if any, on plaintiff's
ability to engage in work-related activities resulting from those

17

diagnoses. In its remand Order, the Court directed the
Commissioner to address this issue, and a review of ALJ Mills'
decision shows that he complied with this directive.

With respect to plaintiff's diagnosis of conversion
disorder, unlike ALJ Slahta, ALJ Mills did not reject this
diagnosis. Rather, he noted the abundant medical evidence
establishing that plaintiff's conversion symptoms, *i.e.*, pseudo-
seizures, ceased upon his discharge from the military in late
1995 and never returned. As a result, there is no basis for
finding that plaintiff suffered functional limitations during the
relevant time period as a result of conversion disorder. (R.
18). Similarly, unlike ALJ Slahta, ALJ Mills did not reject
plaintiff's diagnosis of cognitive disorder. A review of ALJ
Mills' decision shows that he discussed, in detail, the testimony
of Dr. Blair, a highly qualified medical expert, which supported
his finding that a cognitive disorder did not result in any
significant limitations on plaintiff's ability to engage in work-
related activities during the relevant time period. In this
connection, ALJ Mills also noted the report of plaintiff's
psychiatric evaluation by Dr. Bodner on June 28, 2002, during the
relevant time period. In his report, Dr. Bodner specifically
noted that plaintiff's remote and recent memory were good and
that his insight, judgment and intellectual capacity appeared to
be adequate. Significantly, Dr. Bodner characterized plaintiff's

18

cognitive disorder as "mild." (R. 18-19). Based on the foregoing, the Court is compelled to conclude that substantial evidence supports ALJ Mills' determination that plaintiff did not suffer from any significant functional limitations due to conversion disorder and cognitive disorder during the relevant time period.

**ii**

Next, on remand, the Commissioner was directed to address the report of R. Lees, Ph.D. dated April 5, 2001 and the report of Leon Kalson, Ph.D. dated August 14, 2001, which are summarized in Exhibit B to this Memorandum Opinion and support plaintiff's application for DIB during the relevant time period. Again, a review of ALJ Mills' decision shows that he complied with this directive. Although the opinions of Drs. Lees and Kalson concerning the effect of plaintiff's inability to deal with stress on sustained employment were rejected, ALJ Mills adequately explained his reasons for doing so. In particular, ALJ Mills noted the testimony provided by Dr. Blair during the supplemental hearing, and the opinion rendered by Dr. Pacella on February 9, 2004, which support the determination that plaintiff retained the ability to perform sustained work activity despite his mental impairments. (R. 19-20, 24). Thus, substantial evidence also supports ALJ Mills' rejection of the opinions of Dr. Lees and Dr. Kalson.

A determination by another governmental agency that a claimant for disability benefits is disabled is not binding on the Social Security Administration. 20 C.F.R. § 404.1504. Nevertheless, such a determination is entitled to weight and must be considered by an ALJ when presented with a claim for disability benefits under the Social Security Act. Fowler v. Califano, 596 F.2d 600, 603 (3d Cir.1979). Despite this well-established principle, ALJ Slahta ignored plaintiff's VA disability ratings in his decision denying plaintiff's application for DIB. In contrast, on remand, ALJ Mills addressed plaintiff's VA disability ratings at length. (R. 16-27).

Although ALJ Mills concluded that plaintiff's VA disability ratings were entitled to little probative weight, he adequately explained his reasons for this conclusion. First, ALJ Mills noted that plaintiff's VA disability ratings were based primarily on the diagnosis of cognitive disorder, not otherwise specified, which he properly found was not a severe impairment during the relevant period for purposes of plaintiff's application for DIB.[17] Second, ALJ Mills noted that his assessment of

---

[17]In this regard, ALJ Mills also noted that the last disability rating decision in the record, which was issued on November 19, 2002 and resulted in the continuance of plaintiff's 70% disability rating, was subject to "future review examination" because there was a likelihood of "sustained improvement" in plaintiff's condition. (R. 26, 367-68).

20

plaintiff's RFC accommodated the mental limitations which were
supported by the medical evidence in the record. Third, ALJ
Mills noted that the VA disability ratings were issued without
the benefit of the reports of the consultative examinations which
were conducted in connection with plaintiff's application for DIB
or the testimony of Dr. Blair. Fourth, ALJ Mills noted that a
review of the VA rating decisions shows that plaintiff's
subjective complaints were accorded great weight and accepted as
entirely credible. In contrast, ALJ Mills concluded that
plaintiff's subjective complaints were not fully credible and he
adequately explained his reasons for this conclusion. Finally,
ALJ Mills noted that the standard for disability under the Social
Security Act is distinguishable from the VA's disability
standard. Allord v. Barnhart, 455 F.3d 818, 820 (7ᵗʰ Cir.2006)
(The Department of Veterans Affairs requires less proof of
disability than the Social Security Administration.). Under the
circumstances, the Court can find no error in ALJ Mills' decision
to accord limited weight to plaintiff's VA disability ratings.

**iv**

Finally, on remand, the Commissioner was directed to obtain
additional VE testimony in light of ALJ Slahta's impermissible
rejection of plaintiff's diagnoses of conversion disorder and
cognitive disorder which may have resulted in a hypothetical
question that did not include all of the functional limitations

21

resulting from plaintiff's mental impairment. See Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir.1984), citing, Wallace v. Sec'y of Health and Human Servs., 722 F.2d 1150, 1155 (3d Cir.1983) (Where there exists in the record medically undisputed medical evidence of specific impairments not included in a hypothetical question to a vocational expert, the expert's response is not considered substantial evidence).

Although the hypothetical question posed to the VE by ALJ Mills on remand was substantially similar to ALJ Slahta's hypothetical question, it was based on an assessment of plaintiff's RFC that was reached after a proper evaluation of all the medical evidence in the record and included the functional limitations that were supported by substantial evidence. Under the circumstances, ALJ Mills' decision will be affirmed.

William L. Standish
United States District Judge

Date: May _f_, 2009

cc:  Robert Middleton
     928 First Avenue
     New Salem, PA 15468

     Counsel of record

22

EXHIBIT A

\* \* \*

## B. Plaintiff's Hearing Testimony

Plaintiff's testimony at the hearing before the ALJ on December 9, 2003 may be summarized as follows:

Plaintiff, who was 30 years old at the time of the hearing,[18] is single and resides with his parents. (R. 970). With respect to education, plaintiff is a high school graduate. (R. 968). After high school, plaintiff enlisted in the United States Marine Corps. He was honorably discharged in 1995.[19] (R. 969-70). During his military service, plaintiff was hospitalized on numerous occasions for both physical and psychiatric reasons.[20] (R. 985).

With respect to past employment, plaintiff has worked as a floor supervisor for a telemarketing firm,[21] a corrections officer in a prison, and a stocker for a retail electronics store.[22] (R. 969, 974). Plaintiff maintains that he is no longer able to work due to anxiety, fatigue related to sleeping difficulties, headaches, irritability, "the stresses of work," problems dealing with people due to "a lot of distrust" and

---

[18]Plaintiff's date of birth is August 8, 1973. (R. 63).

[19]Plaintiff actively served in the United States military from July 27, 1992 to December 31, 1995. (R. 63).

[20]Plaintiff testified that he suffered seizures while he was in the military, which were diagnosed as "pseudo seizures." With respect to his understanding of the diagnosis, plaintiff testified: "A doctor told me that a pseudo seizure is when the mind lets the body know that it cannot take anymore, and it goes into a remission state, or it just breaks down." Since his discharge from the military, plaintiff's seizures have ceased. (R. 980).

[21]Plaintiff testified that he supervised 25 to 27 employees in this position. (R. 969).

[22]During his military service, plaintiff worked in the supply department where he ordered, received and distributed telephone equipment. (R. 81).

nervousness.[23] When plaintiff gets very irritated, he "snap[s]," saying "a lot of nasty things" and "cuss[ing] a lot," which is "not good in a work environment." (R. 973-74).

Plaintiff attempted to obtain a certificate from the Pittsburgh Beauty Academy through an educational assistance program sponsored by the Veterans Administration ("VA"). However, plaintiff was unable to complete the program due to nervousness from "being around people," an attendance problem as a result of sleepless nights, headaches, anxiety and an attitude problem as a result of his inability "to get them to understand ... how I was feeling, whether I was nervous, or upset." (R. 975, 990).

Plaintiff's medical coverage is provided by the VA. (R. 972). Between January 2003 and the time of the hearing in December 2003, plaintiff had been treated at a VA facility only 2 or 3 times which he attributed to the birth of his son in April and the problems experienced by his fiancee in connection with the pregnancy and birth, difficulties encountered in scheduling medical appointments and inclement weather. (R. 979, 986).

In the month preceding the hearing, plaintiff started taking Prozac for depression and anxiety.[24] He also takes Prevacid for gastroesophageal reflux disease ("GERD"). (R. 972, 978, 983). Plaintiff suffers from migraine headaches "at least five times" a week during which he experiences very sharp pain and sensitivity to light and noise. Plaintiff takes Ibuprofen for the migraine headaches. (R. 981, 989). Plaintiff also suffers from back spasms when he is under a lot of stress. (R. 983).

In the six years preceding the hearing, the only diagnosis which has been made concerning plaintiff's condition is

_____

[23]With regard to sleeping difficulties, plaintiff testified that he did not sleep the night before the hearing, and that he had been awake since 10:00 a.m. the previous day. Despite this problem, sleeping pills have never been prescribed for plaintiff, Rather, he has been instructed to try to relax more before he goes to sleep and take hot baths, "things of that nature." (R. 975-76).

[24]Prior to the Prozac, Effexor had been prescribed for plaintiff's depression and anxiety. Plaintiff testified that he took Effexor for about a year and a half, but that the medication made him nauseous, resulting in the change to Prozac. (R. 972).

conversion disorder.[25] (R. 980). Regarding treatment other than medication, one-on-one counseling and anger management classes have been recommended to plaintiff.[26] (R. 983).

With respect to activities of daily living, plaintiff has a driver's license, and he drives 75 to 100 miles in a typical week. (R. 971). During the day, plaintiff cares for his son with the assistance of his parents because his fiancee attends school. (R. 988). Plaintiff naps twice a day due to his sleeping difficulties. (R. 976-77). Plaintiff's ability to

---

[25]The diagnostic criteria for conversion disorder, which is attached to the brief filed by plaintiff in support of his motion for summary judgment, is described as follows:

**Diagnostic criteria for 300.11 Conversion Disorder**

A. One or more symptoms or deficits affecting voluntary motor or sensory function that suggest a neurological or other general medical condition.
B. Psychological factors are judged to be associated with the symptom or deficit because the initiation or exacerbation of the symptom or deficit is preceded by conflicts or other stressors.
C. The symptom or deficit is not intentionally produced or feigned (as in Factitious Disorder or Malingering).
D. The symptom or deficit cannot, after appropriate investigation, be fully explained by a general medical condition, or by the direct effects of a substance, or as a culturally sanctioned behavior or experience.
E. The symptom or deficit causes clinically significant distress or impairment in social, occupational, or other important areas of functioning or warrants medical evaluation.
F. The symptom or deficit is not limited to pain or sexual dysfunction, does not occur exclusively during the course of Somatization Disorder, and is not better accounted for by another mental disorder.

(Doc. No. 16, Exh. C).

[26]As to scheduling either of these recommendations, plaintiff testified that he was waiting for a referral from the VA, which is "a tedious process." (R. 984).

concentrate is "very effected" by his mental impairments.[27] (R. 978). As a result, he does not read because "the focus isn't there." (R. 991). Plaintiff plays drums in a musical ensemble on Sunday mornings at his church. The group rehearses once during the week.[28] (R. 971). Regarding his activities on the day preceding the hearing, plaintiff got up around 10:00 a.m., drove to the Post Office to get his mail, watched television, helped his father put up the Christmas tree and went to Wal-Mart for his mother. (R. 991). Plaintiff does not cook and he does not socialize with family members who reside nearby. (R. 991).

\* \* \*

(CA 06-594, Doc. No. 22, pp. 3-8).

---

[27]With respect to his concentration difficulties, plaintiff testified that he can get lost while driving in his own neighborhood, requiring him to pull over to try to relax and get himself "together." (R. 978).

[28]In connection with his ability to engage in this group activity, plaintiff testified that he is "comfortable" because his mother plays the piano next to him while he is playing the drums. (R. 990).

EXHIBIT B

* * *

## D. Evidence in the Record

The administrative record in this case contains the
following evidence:

### 1. Letter regarding Plaintiff's Physical Evaluation Board - 6/29/95

On June 29, 1995, the Commanding Officer of the Naval
Hospital at Camp Lejeune in North Carolina prepared a letter
regarding the Physical Evaluation Board which had been convened
for plaintiff. In the letter, plaintiff's initial diagnoses were
described as conversion disorder, histrionic traits and possible
generalized seizures, and the following limitations of duty were
recommended: "No driving military vehicles, firing range,
handling of weapons or ammunition. No field duty or
deployments." (R. 755).

### 2. Addendum to Plaintiff's Physical Evaluation Board - 9/8/95

An addendum to plaintiff's June 29, 1995 Physical Evaluation
Board was prepared on September 8, 1995, setting forth, in
detail, the history of plaintiff's medical condition as
follows:[29]

The patient is a 22-year-old right-handed black male with a
complex history who initially came to medical attention in April
of 1995 when he presented to the emergency room at Naval
Hospital, Camp Lejeune, with an episode presumed to be a seizure.

At the time of his initial presentation, the patient
complained of a one-week history of intermittent periods of left
lower extremity paresthesias generally lasting ten to twenty
minutes at a time occurring one to two times per day. The
patient was brought to the emergency room because he experienced
an episode of left lower extremity motor activity followed by
loss of consciousness while driving a vehicle on Onslow beach at
Camp Lejeune. This vehicle was only traveling a few miles per
hour and the other occupant of the vehicle was able to hit the
brakes. While in the emergency room, the patient was observed to

---

[29]Although the Court's quotation from the addendum to
plaintiff's June 29, 1995 Physical Evaluation Board is lengthy,
it is necessary for a full understanding of the history of
plaintiff's alleged disability.

have another episode described as consisting of several minutes of left lower extremity clonic-like jerking followed by generalized clonic jerking with loss of consciousness followed by a brief "postictal" period of confusion. At that time, the patient was loaded with Dilantin, 1 gram, and admitted to the Internal Medicine Service for further evaluation. The patient received a lumbar puncture at that time to rule out an infectious cause of these symptoms which was completely normal. The patient subsequently underwent an MRI of the brain which revealed three to four tiny punctate lesions characterized by increased signal on T2 weighted images in the subcortical white matter. These were very nonspecific in nature and could be consistent with congenital lesions (old infection, trauma), less likely demyelinating process or vasculitis. Based on these findings, the patient received a second lumbar puncture in order to look for a pleocytosis that might suggest vasculitis. This lumbar puncture was also negative. A CSF electrophoresis, oligoclonal bands, and myelin basic protein were normal. The patient underwent a routine and sleep deprived EEG which failed to delineate any epileptiform activity and were normal. The patient was subsequently discharged from the hospital on a standard dose of Dilantin.

Over the ensuing weeks to months, the patient repetitively was brought to his branch medical clinic and/or the emergency room at Naval Hospital, Camp Lejeune, exhibiting various functional neurological symptoms, the most prominent of which was pseudoseizures. Multiple of these episodes were witnessed and consisted of various limbs exhibiting flailing motor activity associated with retention of consciousness. He was often observed to state emphatically during this motor activity, "I am having a seizure." On one occasion, the patient was brought to the emergency room complaining of generalized weakness (particularly in the lower extremities) and inability to walk. Neurological exam demonstrated completely normal strength and a functional gait. When told to run, the patient ran across the emergency room normally but when asked to walk, he again demonstrated a functional ataxic type of gait. Subsequently, the patient became extremely irritable and frantic, began to cry uncontrollably, and while prone on the gurney in the emergency room began exhibiting clonic-like movements of all four extremities in a somewhat asynchronous fashion. During these movements, the patient lacerated his gum on the metal part of the gurney leading to fairly profuse bleeding. Upon cessation of this motor activity which lasted approximately 90 seconds, the patient exhibited no postictal state and was immediately able to answer all questions regarding orientation to person, place, time, etc. and was quite coherent. Due to the dramatic nature of this event which included the laceration to the gum, the patient

was admitted to the ICU for further observation. In the ICU, an EEG was obtained. It was suggested to the patient that it would be valuable for him to have a seizure while the EEG electrodes were attached and the electroencephalogram was being recorded. Several minutes later the patient started exhibiting bilateral flailing movements of the lower extremities which lasted several minutes. There was no evidence of epileptiform activity on the EEG during this motor activity. The patient was eventually discharged from the hospital on the same dosage of Dilantin. He continued to present to the ER, often transported by his command exhibiting motor activity consistent with nonepileptic seizures. It was subsequently recommended that he be given a trial off of anticonvulsants.

In the middle of August 1995, he was admitted to the Psychiatry Service. (During this three to four month period, the patient had approximately four psychiatric inpatient hospitalizations.) Shortly after admission to the psychiatric ward, the patient gradually became stuporous (unresponsive to verbal commands) and began exhibiting intermittent motor activity every ten to twenty minutes consisting of approximately one to two minutes of tonic contraction of all extremities. Patient was subsequently transferred to the Intensive Care Unit where he remained unresponsive and continued to have these brief periods of intermittent tonic activity associated with gasping respirations. These gasping respirations lead to oxygen desaturations as monitored by pulse oximetry (as low as the mid 70s percentage of O2 saturation). The patient was treated for presumed status epilepticus with several doses of Lorazepam and Diazepam and was reloaded with 1 gram of Dilantin IV over a course of approximately 30 to 45 minutes. These episodes gradually abated. The patient was intubated due to the gasping respirations with decreased oxygen saturation. Another lumbar puncture was performed to rule out an infectious cause for the stuporous state. This was completely normal. The patient was subsequently extubated within a few hours, after which he exhibited no more abnormal motor activity and two days later he was discharged from the hospital. The patient has subsequently been readmitted to the Psychiatry Service at Naval Hospital, Camp Lejeune, for ongoing pseudoseizures/conversion reaction.

(R. 839-41).

### 3. **Letter from Physical Evaluation Board – 10/10/95**

By letter dated October 10, 1995, plaintiff was notified that the Record Review Panel of the Physical Evaluation Board of the Department of the Navy evaluated his case on October 2, 1995 and found that he was "unfit for duty" due to the following diagnoses: (1) conversion disorder, (2) conversion neurological

symptoms, (3) pseudoseizures, (4) epilepsy and (5) status post episode of status epilepticus. The letter indicated that plaintiff's disability was assigned a 30% rating, and that plaintiff had been placed on the Temporary Disability Retired List. (R. 428-31).

## 4. VA Records - 2/9/96

On February 9, 1996, Karen Galin, Ph.D. performed a psychological assessment of plaintiff at the VA Medical Center in Pittsburgh based on a referral by the Neurology Department. Plaintiff informed Dr. Galin that his first seizure occurred in May 1995; that his last seizure occurred in September 1995; and that at the time the seizures developed, he was under stress from "having to do more work than others ... picking on me," and due to his staff sergeant "being on my back ... bothering me, calling me names." Plaintiff noted that he developed irritability, anger and aggressivity at about the same time. Following plaintiff's mental status examination, Dr. Galin described her diagnostic impression as conversion disorder and seizures versus pseudo-seizures. With respect to a treatment plan, Dr. Galin noted that plaintiff denied any distress and stated that he was not interested in any psychotherapy at that time. Plaintiff indicated that he had been told to get registered in the Pittsburgh system "in case he should have problems in the future." (R. 211-13).

## 5. VA Records - 2/26/96

On February 26, 2006, plaintiff underwent a compensation examination by Thomas Eberle, Ph.D. in connection with his pursuit of a determination that his conversion and seizure disorders were service-connected, entitling him to disability benefits from the VA.[30] Plaintiff reported that his first seizure occurred in May 1995, while he was driving a trash vehicle on the beach in North Carolina, and that his last seizure occurred in September 1995, when he began to choke on food and lost consciousness in the mess hall. Plaintiff denied "psychiatric problems of any kind including depression, anxiety, or other behavioral or emotional symptomatology." Dr. Eberle noted that none of plaintiff's medical records from his period of military service were available for review at the time of this examination. (R. 210-11).

With respect to clinical observations, Dr. Eberle noted that plaintiff was alert, oriented in all 3 spheres, in good contact with reality and showed no signs or symptoms of psychosis.

---

[30]Plaintiff applied for disability benefits from the VA on January 3, 1996. (R. 440).

Plaintiff spoke in normal tones, rhythm and rates (although he seemed "a rather serious and somber person"), and he was polite and socially appropriate. Plaintiff's memory and intellect appeared to be intact, and there was no indication of concentration difficulties. Dr. Eberle noted that plaintiff "seemed rather indifferent to the nature of his seizure disorder and its possible effects or consequences and asked more specific questions about how a service connected disability would interact with vocational allotments from the government towards the end of attending school." Dr. Eberle described plaintiff's insight and judgment with respect to the nature of his conversion reactions as "minimal" at that time. (R. 209-10).

Based on the available medical records and his clinical examination of plaintiff, Dr. Eberle opined that plaintiff's possible diagnoses included conversion disorder, passive dependent personality disorder with passive aggressive features and seizure disorder, indicating that the "key to differential diagnosis" in plaintiff's case would be a "very thorough review of [plaintiff]'s prior psychiatric and neurological records," together with his current examination.[31] (R. 208-09).

### 6. VA Records - 6/11/96

On June 11, 1996, David J. Fink, M.D., Chief of Neurology at the VA Medical Center in Pittsburgh, issued a memorandum to the Rating Board in connection with plaintiff's compensation examination. The memorandum stated: "I have reviewed the records of Robert Middleton. Based on these records, it is clear that this patient has pseudoseizures. There is no compelling evidence for seizures. No further neurologic evaluation is required at this time." (R. 441).

### 7. VA Records - 7/17/96

On July 17, 1996, the VA issued a Rating Decision in connection with plaintiff's January 3, 1996 claim for disability benefits from the VA. The issue was described as service connection for hemorrhoids and seizure/conversion disorder, and the decision was a denial. Specifically, the decision states: "Compensation is payable for a disease or injury which causes a disabling physical or mental limitation. The evidence regarding pseudoseizures and hemorrhoids fails to show a disability for which compensation may be established." (R. 438-40).

---

[31]With respect to Dr. Eberle's clinical impression of "rule out conversion disorder," the doctor stated that he could not be more specific due to the unavailability of plaintiff's medical records from the service. (R. 209).

## 8. VA Records - 3/11/97

On March 11, 1997, plaintiff underwent an examination by William R. Bodner, M.D. at the VA Medical Center in Salisbury for compensation purposes.[32] In his report of the examination, Dr. Bodner described, in detail, plaintiff's "rather complicated" past medical history. With respect to plaintiff's mental status examination, Dr. Bodner noted, among other things, that plaintiff was alert, cooperative and volunteered information; that plaintiff exhibited no bizarre movements or tics; that plaintiff's mood was calm and his affect was appropriate; that plaintiff demonstrated no delusions, hallucinations, ideas of reference or suspiciousness; that plaintiff was oriented in all 3 spheres; that plaintiff's memory, both recent and remote, was good; and that plaintiff's insight, judgment and intellectual capacity appeared to be adequate. Dr. Bodner's diagnosis was cognitive disorder, not otherwise specified, and he recommended that plaintiff receive a complete neurological workup to ascertain the true nature and extent of his symptoms. (R. 424-27).

## 9. VA Records - 3/19/97

On March 19, 1997, an evaluation of plaintiff was performed by Thomas J. Harbin, Ph.D., a neuropsychologist, in connection with plaintiff's claim for disability compensation from the VA.[33] (R. 416-21). With respect to clinical observations, Dr. Harbin stated in his report: "The overall impression that [plaintiff] gave was of an intense, African-American male of average intelligence. His history was presented in a mildly dramatic fashion. There was no evidence of symptom feigning or exaggeration and this evaluation is most likely a valid estimate of the patient's current psychological and behavioral functioning." (R. 418).

Dr. Harbin administered several tests to plaintiff. Regarding the Minnesota Multiphasic Personality Inventory - 2 (MMPI-2), Dr. Harbin reported that the results were valid and suggested plaintiff was experiencing "a great deal of turmoil," and that plaintiff's psychological distress may "result in physical symptoms for which no organic pathology is obvious."

---

[32]Plaintiff appealed the VA's July 17, 1996 denial of his claim for disability benefits, resulting in this examination of plaintiff, as well as a neuropsychological examination of plaintiff on March 19, 1997.

[33]With regard to his evaluation of plaintiff, Dr. Harbin noted that medical records and military information were not available for his review. (R. 416).

Turning to the Wechsler Adult Intelligence Scale - Revised (WAIS-R), plaintiff's scores placed him on the border between average and below-average intellectual functioning. As to the other tests administered by Dr. Harbin, plaintiff's performance on tests of memory was inconsistent, his performance on measures of attention was within normal limits with few deficiencies noted, his performance on language tests was within normal limits with few deficiencies noted, and his visual perception and reconstruction were severely impaired. (R. 418-20).

In his summary, conclusions and recommendations, Dr. Harbin indicated, among other things, that there was evidence of cognitive impairment in plaintiff's performance; that plaintiff's personality evaluation was consistent with brain damage, noting that plaintiff "is likely to be anxious, tense, restless, extroverted, and aggressive;" that any elevation in plaintiff's "perceived stress level will result in the development of physical symptoms for which there may be no obvious organic basis;" and that his diagnostic impression was cognitive disorder, not otherwise specified. (R. 420-21).

### 10. VA Records - 6/2/97 to 6/16/97

A Rating Decision was issued on June 2, 1997 in connection with plaintiff's claim for disability benefits from the VA. The issue was described as "Service connection for cognitive disorder, not otherwise specified (claimed as seizure/pseudo-seizure disorder)," and the finding was favorable to the extent that plaintiff's condition was determined to be 10% disabling effective January 1, 1996.[34] (R. 412-14).

In the statement of reasons for the decision, the examiner noted, among other things, that there was "no evidence of symptom feigning or exaggeration;" that plaintiff's psychological assessment was "felt to be valid;" that there was evidence of cognitive impairment in performance; and that plaintiff's personality evaluation was consistent with brain damage. (R. 413).

---

[34]The Rating Decision noted that an evaluation of 10% disabling "is granted whenever there is occupational and social impairment due to mild or transient symptoms which decrease work efficiency and ability to perform occupational tasks only during periods of significant stress; or symptoms controlled by continuous medication." (R. 412).

Plaintiff was notified of the VA's Rating Decision on June 3, 1997 (R. 409-10), and, on June 16, 1997, plaintiff registered his disagreement with the decision, arguing that (1) due to his inability to handle stress, he continually had to take breaks at work, and (2) he was discharged from the United States Marine Corps with a 30% disability rating. (R. 404).

## 11. VA Records - 8/9/97

On August 9, 1997, the VA issued a further Rating Decision with respect to the evaluation of plaintiff's cognitive disorder, NOS as 10% disabling. Based on evidence submitted by plaintiff, his employer and the Naval Hospital at Camp Lejuene, North Carolina, plaintiff's cognitive disorder, NOS was increased to 30% disabling effective January 1, 1996.[35] (R. 392).

## 12. Report of Periodic Physical Examination - 9/22/97

On September 22, 1997, plaintiff underwent his periodic physical examination at the Naval Hospital at Camp Lejeune, North Carolina. The report of the examination indicates that plaintiff had been placed on the Temporary Disability Retired List for the following diagnoses: conversion disorder, pseudoseizures, epilepsy and status post status epilepticus. The report further indicates that since his placement on the Temporary Disability Retired List, plaintiff had been employed intermittently and was currently employed as a telephone operator, and that plaintiff had lost time from work "due to fears, miss-trustfulness (sic), suspiciousness and feelings of being persecuted." (R. 388).

At the time of the examination, plaintiff continued to complain of difficulty maintaining his job, nervousness, trembling, shaking, fears and spasms, and, during the examination, plaintiff was described as "quite suspicious, mistrusting and misinterpreted perceptions." (R. 388). The examiner recommended that plaintiff continue regular supportive

---

[35]The Rating Decision noted that an evaluation of 30% disabling "is granted whenever there is occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal), due to such symptoms as: depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment, mild memory loss (such as forgetting names, directions, recent events)." The Rating Decision also noted that a statement from plaintiff's employer indicated that plaintiff "is given a break of at least 15 minutes every 2 hours to avoid headaches and fatigue." (R. 392).

psychotherapy on an outpatient basis, and that he follow-up with the Neurology Department for seizures. The examiner stated that no medications were indicated at that time, and it was his opinion that plaintiff remained unfit for military service and should be placed on "permanently retired with a medical disability." Plaintiff's final diagnoses were (1) conversion disorder, (2) common migraine headaches, (3) pseudoseizures, (4) history of seizure disorder, and (5) paranoid personality disorder. (R. 389).

## 13. VA Records - 5/5/00

On May 5, 2000, plaintiff presented to the Emergency Room of the VA Medical Center in Fayetteville, North Carolina requesting to "see mental health today," because he had been depressed, nervous and suffering from insomnia since 1996 but had never been treated with medication for any of these problems. Plaintiff was referred for a mental health evaluation during which he reported suffering from severe headaches for a long time, as well as an inability to sleep well. Plaintiff also reported that he was depressed, irritable and had begun to isolate himself. Plaintiff was described as alert, oriented to time, place and person, and cooperative with an irritable, dysphoric mood. Paxil, Ambien and Hydroxyzine were prescribed for plaintiff. (R. 380).

## 14. VA Records - 4/5/01

On April 5, 2001, plaintiff underwent an examination by R. Lees, Ph.D. for VA compensation purposes. Dr. Lees noted that plaintiff's last compensation examination had been performed on February 2, 1996 and resulted in a service-connected disability rating of 30% based on an "unspecified cognitive deficit (conversion disorder/pseudo-seizures)." With respect to plaintiff's mental status examination, Dr. Lees noted that plaintiff was casually dressed, well groomed and cooperative during the interview; that plaintiff appeared tense, depressed and anxious; that plaintiff's score on the Beck Depression Inventory was 34, placing him in the range of severe depression;[36] that plaintiff's score on the Beck Anxiety Index was 33, which also is in the severe range; that plaintiff reported symptoms of "feeling shaky, hands trembling, numbness or tingling, feeling hot, dizzy or light-headed, heart pounding or racing, indigestion or discomfort in the abdomen;" that plaintiff denied psychotic symptoms and none were manifested during the

---

[36]In this regard, Dr. Lees noted that plaintiff reported loss of interest in other people, feeling too tired to do anything, dissatisfaction or boredom with everything, feeling guilty a good part of the time, no appetite at all and less interest in sex. (R. 345).

examination; that plaintiff's attention and concentration were variable; and that plaintiff's insight and judgment were limited.

Dr. Lees' diagnoses included (a) cognitive deficit, NOS (conversion disorder/pseudoseizures), chronic; (b) history of seizures; and (c) severe psychosocial stressors, and he rated plaintiff's score on the Global Assessment of Functioning ("GAF") scale as a 48.[37] Dr. Lees summarized his examination of plaintiff as follows:

> SUMMARY: This complicated individual continues to demonstrate the interconnected sensory, motor and psychological symptoms consistent with previous findings. It does appear that his combined symptoms underlying his unspecified cognitive deficit have increased in intensity. He has not been able to maintain employment. He is showing severe symptoms of both depression and anxiety along with the conversion symptoms of numbing and prickly sensations coming under any kind of stress. He does not appear to be able to maintain employment. He was recommended to obtain treatment at this facility. He expressed interest in this. He will be referred to Omega Team.

(R. 342-46).

### 15. **VA Records - 7/6/01**

Plaintiff presented to the VA Medical Center in Pittsburgh for a follow-up visit in connection with his history of seizures and conversion disorder. Plaintiff reported that he had been free of "conversion reactions" since 1995, and that his problems since that time have been psychological. A current screening for mental disorders was discussed and plaintiff agreed with this plan. (R. 207-08).

---

[37]The GAF scale considers psychological, social and occupational functioning on a hypothetical continuum of mental health - illness and is used by clinicians to report an individual's overall level of functioning. The highest possible score is 100 and the lowest is 1. GAF scores between 41 and 50 denote the following: "**Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job)." (Emphasis in original). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM-IV"), pp. 32-34.

**16. Report of Leon Kalson, Ph.D. - 8/14/01**

On August 14, 2001, plaintiff underwent a consultative psychological evaluation by Leon Kalson, Ph.D. at the request of the Pennsylvania Bureau of Disability Determination in connection with his application for DIB. (R. 113-17). With respect to plaintiff's mental status examination, Dr. Kalson noted that plaintiff "registered constricted affect with appropriate eye contact," and that he was "articulate and matter of fact."[38] Dr. Kalson diagnosed plaintiff as suffering from conversion disorder (300.11) and seizure disorder, and he indicated that plaintiff's prognosis was "Chronic." Dr. Kalson described his summary and conclusion as follows:

> Present evaluation reveals that Robert Middleton's occupational function is severely limited by conversion symptoms, depression, and affective instability. He is treated by the VA and has been granted a 70% disability rating. He is presently unable to cope with the stresses and demands of sustained gainful employment and has begun cosmetology training under OVR sponsorship."[39]

(R. 113-17).

**17. Psychiatric Review Technique Form - 9/25/01**

On September 25, 2001, a Psychiatric Review Technique form was completed by Douglas Schiller, Ph.D, a non-examining State agency physician, in connection with plaintiff's application for DIB. Dr. Schiller indicated that plaintiff suffers from conversion disorder, which (a) mildly limits his activities of daily living; (b) moderately limits his social functioning and ability to maintain concentration, persistence and pace; and (c) has not resulted in any episodes of decompensation of extended duration. (R. 119-32).

---

[38]Dr. Kalson also noted that plaintiff explained his situation as follows: "I'm not looking to sit on my ass. I'm going to Pittsburgh Beauty Academy through OVR where I'm making A's and B's. I'm easily stressed. I get shaky with chronic headaches; they tried antidepressants. I feel I'll be able to cope better if I can work on a part-time basis. I stay to myself because I get pissed off easily and want to avoid confrontations which I can't handle." (R. 114).

[39]Plaintiff's disability rating for his cognitive disorder had been increased from 30% to 70% by a VA Rating Decision dated May 25, 2001. (R. 164).

**18. Mental Residual Functional Capacity Assessment - 9/25/01**

Dr. Schiller also completed a Mental Residual Functional Capacity Assessment for plaintiff on September 25, 2001. With respect to sustained concentration and persistence, Dr. Schiller indicated that plaintiff's ability to work in coordination with or proximity to others without being distracted by them *and* his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods were moderately limited. As to social interaction, Dr. Schiller indicated that plaintiff's ability to accept instructions and respond appropriately to criticism from supervisors was moderately limited. Finally, regarding adaptation, Dr. Schiller indicated that plaintiff's ability to respond appropriately to changes in the work setting was moderately limited. In elaborating on his conclusions, Dr. Schiller stated, among other things, that, while plaintiff's allegations are partly credible, he appeared capable of routine substantial gainful activity in a stable setting. (R. 133-35).

**19. Records of Onslow Memorial Hospital - 10/24/01**

On October 24, 2001, plaintiff presented to the Emergency Room of Onslow Memorial Hospital in Jacksonville, North Carolina with the following complaint: "felt body moving, body tingling." Plaintiff was diagnosed with anxiety and nicotine withdrawal, and he was given Valium. (R. 137-40).

**20. Records from Jacksonville Family Medical Center - 11/16/01**

Plaintiff presented to the Jacksonville Family Medical Center in Jacksonville, North Carolina on November 16, 2001 to "establish care," and he was evaluated by Dr. Ricky Thomas. Plaintiff reported that his past medical history included epilepsy and conversion disorder. Plaintiff also reported that he suffered from insomnia and frequent headaches which cause photophobia and dizziness. With respect to the review of plaintiff's systems, Dr. Thomas noted, among other things, that plaintiff denied fatigue, depression, anxiety, memory loss, mental disturbance, suicidal ideation, hallucinations and paranoia. However, plaintiff reported that he has GERD. As to plaintiff's physical examination, Dr. Thomas described plaintiff, generally, as "well nourished, well hydrated, no acute distress." Finally, regarding plaintiff's mental status examination, Dr. Thomas indicated that plaintiff's judgment was intact, he was oriented to time, place and person, his memory was intact for recent and remote events and he did not appear depressed, anxious or agitated. (R. 142-43).

**21. Report of Final Periodic Physical Examination - 11/28/01**

On November 28, 2001, plaintiff underwent a "final periodic physical examination" at the Naval Hospital at Camp Lejeune, North Carolina. (R. 165-66). The report of the examination indicates that plaintiff had been placed on the Temporary Disability Retired List on January 1, 1996 with the diagnoses of conversion disorder and conversion neurologic symptoms. During the examination, plaintiff complained of continual stress, frequent headaches, fatigue and stomach pain from GERD, and plaintiff reported that he had remained seizure and pseudoseizure free since his discharge from the military. Plaintiff also reported that he found himself "needing to be by himself;" that he has a short temper and does not trust people; and that he was seeking mental health care to deal with stress. (R. 166).

The examining physician described plaintiff's mental status examination as follows:

> Mental status examination at the time of evaluation revealed a well developed, well nourished African/American male who appeared his stated age and who was in no acute distress. He maintained good eye contact. Speech was of normal rate, rhythm and volume and was without pressure. Mood was euthymic with a full mood congruent affect. Thought processes were logical, linear, and goal directed. Thought content was notable for themes of distrust of others but there was no frank delusions or hallucinations. Cognition was intact. Insight was fair. Judgment was intact. He denied suicidal or homicidal ideations.

(R. 166).

The examining physician's diagnoses included conversion disorder, resolved, undifferentiated somatoform disorder, anxiety disorder, NOS and personality disorder, NOS, and he rendered the opinion that plaintiff remained unfit for military service and should be medically discharged from the military or permanently retired on disability. (R. 166).

**22. VA Records - 12/18/01**

A Rating Decision was issued by the VA on December 18, 2001 with respect to plaintiff's entitlement to individual unemployability and eligibility for Dependents' Educational Assistance under Chapter 35 of the United States Code. The decision granted individual unemployability to plaintiff "because the claimant is unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities," and denied plaintiff's eligibility for Dependents'

Educational Assistance based on his failure to show that he had a
total service-connected disability which was permanent in nature.
(R. 164).

## 23. **Findings of the Physical Evaluation Board Proceedings - 2/6/02**

On February 6, 2002, findings were issued in connection with
plaintiff's Physical Evaluation Board Proceedings which
originated at Camp Lejeune in North Carolina. Specifically, it
was determined that plaintiff was "unfit" for military service,
and it was recommended that plaintiff be separated from the
Temporary Disability Retired List with severance pay. The
"unfitting condition" was listed as anxiety disorder, NOS, and
the conditions which contributed to the unfitting condition
included conversion disorder, epilepsy, status post episode of
status epilepticus, undifferentiated somatoform disorder,
pseudoseizures and conversion neurological symptoms. (R. 162-
63).

## 24. **VA Records - 9/20/02**

On September 20, 2002, plaintiff underwent a psychiatric
evaluation at the VA Medical Center in Pittsburgh by Dr. Nasim
Shajihan. Plaintiff described his chief complaint at that time
as follows: "I feel like I am a walking time bomb." Plaintiff
indicated that he had been "100% unemployable since January,"
reporting that he had been on 70% disability since the previous
June. Plaintiff also reported that his stress level had
increased because the VA "might reduce his unemployability"
rating.[40] Dr. Shajihan's diagnoses included (1) major
depression, single episode, (2) generalized anxiety disorder and
(3) schizoid personality traits, and he rated plaintiff's GAF
score as a 45.[41] Medications were discussed, and plaintiff was
to make a decision with respect to medications by his next
appointment which was scheduled for the following week. (R. 203-
05).

---

[40]Other stressors reported by plaintiff at that time included
the pregnancy of his girlfriend of two months and the illness of
his parents. With respect to his mental state, plaintiff
reported feeling depressed and anxious all the time, worrying
excessively about what is going to happen, difficulty
concentrating, an inability to enjoy anything, being very
withdrawn, an inability to sleep, frequent headaches,
irritability and muscle tension. (R. 204).

[41]As noted in footnote 24, a GAF score between 41 and 50
denotes serious symptoms or any serious impairments in social,
occupational or school functioning.

### 25. **VA Records - 10/4/02**

Plaintiff returned to the VA Medical Center in Pittsburgh for a follow-up visit with Dr. Shajihan on October 4, 2002. Plaintiff reported that he "[c]ontinues to be very depressed and anxious, feels some tension in his abdomen, has difficulty sleeping at night, is up most of the night, is very irritable, says he is not actively suicidal or homicidal, but is unable to function and cannot work at this time." During the visit, plaintiff stressed his inability to work and the increase in his stress level due to notice from the VA that his disability benefits might be reduced. Dr. Shajihan rated plaintiff's GAF score as a 50. Effexor was prescribed for plaintiff, and he was instructed to return in 2 weeks for a follow-up visit. (R. 202-03).

### 26. **VA Records - 11/8/02**

Plaintiff returned to the VA Medical Center in Pittsburgh for a follow-up visit with Dr. Shajihan on November 8, 2002. Plaintiff reported being stressed out by the ongoing VA proceedings regarding his disability status. Plaintiff stated that he was very depressed and anxious, unable to focus on anything, afraid that people do not understand him, and worried that he might deteriorate if forced to go back to work. Dr. Shajihan rated plaintiff's GAF score as a 50, and he increased the dosage of Effexor to be taken by plaintiff. (R. 199-200).

\* \* \*

(CA 06-594, Doc. No. 22, pp. 9-32).